## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | C/A No. 24-00935-EG |
| Partners In Hope, Inc., | Chapter 11 |
| Debtor(s). | **ORDER** |

   **THIS MATTER** is before the Court on the Motion for Relief from the Automatic Stay ("Stay Motion")[1] and Motion to Prohibit Use of Cash Collateral ("Cash Collateral Motion") filed by West Town Bank & Trust f/k/a West Town Savings Bank ("West Town Bank").[2]  Partners In Hope, Inc. ("Debtor") filed objections to West Town Bank's Motions.[3]  The United States Trustee (the "UST") filed a Response to the Cash Collateral Motion, reserving his rights to fully participate at the hearing.[4]  A contested hearing was held on May 2, 2024, and was attended by Debtor's representative and its counsel, West Town Bank's representative and its counsel, and counsel for the UST.  The parties stipulated to the introduction of various exhibits into the record.  The Court heard testimony from Terry McLean, a member of Debtor's Board of Directors and sole owner of Capture Cares Assisted Living, LLC ("Capture Cares"); Mick Crawford, West Town Bank's Senior Vice President and Credit Manager; Frank Worrell, Debtor's retained certified public accountant; and Mark Ruday, Managing Director for Newpoint Advisors Corporation ("Newpoint"), Debtor's retained financial advisor.  At the conclusion of the parties' cases in chief, and after all the testimony and stipulated exhibits were admitted into evidence, Debtor and West Town Bank agreed to submit their closing arguments through briefs, which were then filed on May

---

[1] ECF No. 22, filed Mar. 29, 2024.
[2] ECF No. 28, filed Apr. 6, 2024.
[33] ECF Nos. 31 and 35, filed Apr. 10 and 11, 2024.
[4] ECF No. 51, filed Apr. 26, 2024.

9, 2024.[5]  This Court has jurisdiction of this proceeding under 28 U.S.C. § 157 and this motion is

a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), and (M).  After careful consideration

of the evidence presented, the arguments of the parties, and the entire record before it, the Court

makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Debtor is a non-profit corporation organized under the laws of the State of South Carolina

on November 18, 2009.[6]  On March 13, 2024 (the "Petition Date"), Debtor filed for relief under

Chapter 11 of the Bankruptcy Code.[7]  To date, it has remained in possession of its property and

continues to operate its business pursuant to 11 U.S.C. §§ 1107 and 1108.  Debtor is the owner of

real property in Loris, South Carolina ("Loris Property")[8] and in Murrells Inlet, South Carolina

("Murrells Inlet Property").[9]  In its bankruptcy schedules, Debtor listed the Loris Property as

having a current value of $12 million and the Murrells Inlet Property as having a current value of

$12.5 million.[10]  Both properties are presently leased to Capture Cares.  Under the terms of its

lease with Debtor, Capture Cares is obligated to pay rent equivalent to the mortgage payment for

each property directly to West Town Bank.[11]  Capture Cares, which is owned solely by McLean,

presently operates an assisted living facility at the Murrells Inlet Property, known as Inlet Oaks.

McLean, Debtor's representative and board member, is also the sole owner of Capture Cares.  The

Loris Property previously operated as an assisted living facility—Oaks of Loris—but closed in

June of 2023 after the Department of Health and Environmental Control ("DHEC") revoked its

---

[5] ECF Nos. 75 and 76.
[6] Bank's Ex. M (Stay Motion).
[7] ECF No. 1.
[8] The Loris Property includes real property located at 260 Watson Heritage Road, Loris, South Carolina and 1401 Heritage Road, Loris, South Carolina.
[9] The Murrells Inlet Property is located at 12287 Hwy 707, Murrells Inlet, South Carolina.
[10] ECF No. 1.
[11] Bank's Ex. T (Cash Collateral Motion).  The lease agreement was entered into between Debtor and Capture Cares on January 24, 2023.

license due to unclean and unsafe conditions.  To date, it has yet to reopen.  The Loris Property

has another building on the property owned by Debtor, which is leased to Horry County Council

on Aging ("HCCA") for approximately $1,400.00 per month.   The lease to HCCA is scheduled

to expire on July 31, 2024, and the parties have not yet agreed on terms for its renewal.  Debtor

has no other business operations beyond being the owner and landlord of the Loris and Murrells

Inlet Properties.

### Loris Property Loans

On December 12, 2013, to fund the construction of the assisted living facility on the Loris

Property, Debtor obtained a loan of $6,490,000.00 from the United States Department of

Agriculture/Rural Development (the "USDA"), which is secured by a mortgage on the Loris

Property.  The loan was part of a USDA Community Facilities Loan Program that is traditionally

used to finance the borrowing needs of rural municipalities, counties, and non-profit organizations.

Debtor qualified for these loans as a non-profit constructing assisted living facilities in an area

where it was determined there was a need for such establishments.   USDA also perfected its

security interest in Debtor's personal property by filing a financing statement on December 12,

2023, covering the following collateral: "[a]ll of the personal property, equipment, fixtures,

revenues, fees, charges, assessments, all income from whatever source derived, accounts

receivable, and other choses in action of whatever nature in connection with the operation of the

facilities of the Debtor located on the [Loris Property]."[12]

Debtor obtained an additional loan of $1 million from West Town Bank in 2014, for the

purpose of construction and permanent financing for the assisted living facility (the "Loris Loan

Agreement").  In return for the loan, Debtor granted West Town Bank a security interest and lien

---

[12] Bank's Ex. L (Stay Motion) (Exhibit D to the Foreclosure Summons and Complaint filed in Horry County, 2023-CP-26-0681)

upon all of its assets.  Debtor also executed a mortgage in favor of West Town Bank, granting the

bank a lien on the Loris Property ("Loris Mortgage").  The Loris Mortgage was recorded on August

26, 2014, and includes an assignment of rents.[13]  West Town Bank further perfected security

interests in Debtor's personal property by filing a financing statement with the South Carolina

Secretary of State on December 12, 2023 (the "Financing Statement").  The Financing Statement

covers "[a]ll assets of Debtor, of every kind and nature, now existing and hereafter acquired and

arising wherever located."

West Town Bank and the USDA executed an Intercreditor Agreement on August 26, 2014

("Loris Intercreditor Agreement"), whereby the parties acknowledged they each provided loans to

Debtor secured by the Loris Property and all personal property owned by Debtor and agreed that

each of their liens on the Loris Property "shall rank *pari passu* with the other and that all of the

Common Property shall be held for the benefit and security of both Banks."[14]  Pursuant to the

Loris Intercreditor Agreement, "Bank's percentage share of the lien position is equal to the

proportion that the principal amount then outstanding to [West Town Bank] bears to the total

principal amount then outstanding to [West Town Bank] and the USDA and its assigns."

### Murrells Inlet Loans

Debtor also entered into similar loan agreements with the USDA and West Town Bank for

the Murrells Inlet Property, which were also a part of the USDA Community Facilities Loan

Program.  On May 14, 2014, Debtor obtained a loan for $6,420,000.00, secured by a recorded

---

[13] Bank's Ex.C (Stay Motion), at § 2.01(d).  Section 2.01(d) provides:
> Mortgagor [Debtor] does hereby grant, bargain, sell, convey, mortgage and warrant to Mortgagee
> [Bank] and its successors and assigns forever the Real Property, and all of Mortgagor's estate, right,
> title and interest therein, together with the following described property (the "Other Property"):
> . . .
> (d) All rents, issues, deposits and profits accruing and to accrue from the Real Property and Other
> Property and the avails thereof.

[14] Bank's Ex. D (Stay Motion).

mortgage in favor of USDA on the Murrells Inlet Property.[15]  The USDA similarly perfected its security interest in Debtor's personal property by filing a financing statement.

Debtor and West Town Bank executed a Loan Agreement and Security Agreement dated September 29, 2015 with respect to the Murrells Inlet Property.  In that Agreement, Bank agreed to loan to Debtor $2 million to facilitate improvements to the Inlet Oaks facility on the Murrells Inlet Property, and Debtor granted West Town Bank a security interest and lien upon all of Debtor's assets ("Murrells Inlet Loan Agreement").[16]  To secure the repayment of the Murrells Inlet Loan Agreement, Debtor executed a mortgage in favor of Bank ("Murrells Inlet Mortgage"), granting West Town Bank a lien on the Murrells Inlet Property and an assignment of rents.[17]  The Murrells Inlet Mortgage was recorded on September 29, 2015.

As with the Loris Loan Agreement, West Town Bank and the USDA executed an Intercreditor Agreement on September 29, 2015 ("Murrells Inlet Intercreditor Agreement"). The Murrells Inlet Intercreditor Agreement contained identical terms to the Loris Intercreditor Agreement.

### Outstanding Debt Owed to USDA and West Town Bank

Mick Crawford, Senior Vice President of West Town Bank, testified that the payments due to West Town Bank are $8,990.00 per month for the Loris Loan Agreement and $17,948.00 per month for the Murrells Inlet Loan Agreement.  The payments due to USDA are $24,571.00 for the Loris Property and $25,512.00 for the Murrells Inlet Property.  Despite a three-month deferment period from December of 2022 through March 29, 2023, neither Debtor nor Capture Cares has made any payments due under either the Loris Loan Agreement or the Murrells Inlet Loan

---

[15] Bank's Ex. M (Cash Collateral Motion)
[16] Bank's Ex. H (Cash Collateral Motion).
[17] Bank's Ex.  J (Cash Collateral Motion).

Agreement to West Town Bank since December 6, 2022.  Mr. Crawford testified the amount owed

to West Town Bank under the Loris Loan Agreement is $1,150,587.14, and the amount owed

under the USDA loan is $6,074,658.56, for a total outstanding balance of $7,225,245.70.

According to Debtor, the amount owed to West Town Bank under the Murrells Inlet Loan

Agreement is $2,267,707.00 and the amount owed under the USDA loan is $6,036,553.00, for a

total outstanding balance of $8,304,260.00.

### Debtor's Board of Directors and Management Company

Debtor is operated by a five-member board of directors.  As of December of 2022, the

business operations on the Loris Property and Murrells Inlet Property were managed by  Coastal

Senior Solutions, LLC ("CSS").   Unlike Coastal Cares, CSS paid the monthly rent for the

properties directly to Debtor.  On December 7, 2022, Debtor held an emergency meeting at the

request of CSS to discuss financial misconduct allegations by CSS's co-owner and accountant,

Tim Hucks.  At the meeting, board members questioned Hucks about possible misappropriation

of funds and presented him with evidence of the misappropriation.  As a result, Hucks resigned

from CSS, and Debtor's board of directors terminated the management contract with CSS.

Following the resignation of three board members, the board elected new board members—Terry

McLean, Phillip McLean, and David Barilla—as well as new officers.  Since December 12, 2022,

the board of Debtor has been comprised of the following members:  David Barilla, Donna

Weiskircher, Terry McLean, Phillip McLean and Nathel Moody (collectively, the "Board").  On

December 12, 2022, the Board adopted new bylaws and hired Capture Cares as its management

company.  Due to the possible misappropriation of funds by CSS and its owners, in January of

2023 the Board moved to instigate a forensic audit of Debtor's financials.  McLean testified that

Debtor intends to pursue investigation and recovery of the misappropriated funds possibly totaling as much as $1 million.

When Capture Cares took over the management of the Oaks of Loris and Inlet Oaks, it inherited numerous problems resulting from CSS's mismanagement of the properties. CSS had failed both to renew the license at the Loris Property and to maintain that property or pay its bills. CSS had entered into rental agreements with tenants at both the Oaks of Loris and Inlet Oaks facilities at rates that did not provide sufficient funds to run the facilities. There were also significant mold issues at the Loris Property that required remediation. Under the terms of the lease with Debtor, Capture Cares was responsible to maintain and repair the physical buildings. McLean testified that Capture Cares lacked sufficient funds to pay for both the repairs and the mortgages on the properties.

On February 3, 2023, DHEC issued an administrative order revoking Debtor's license to operate Oaks of Loris as a community residential care facility. According to McLean, Debtor received a 96-page document from DHEC setting forth the numerous violations that had to be addressed to obtain its license to operate. The Board voted to satisfy the DHEC violations first and never issued a notice of default to Capture Cares based upon its failure to pay the mortgages on the Loris and Murrells Inlet properties. In March of 2023, the Board met to discuss the financial position, rent rolls, and maintenance of each property, and moved to attempt to sell the Murrells Inlet Property. At the April 2023 meeting, the Board discussed issues pertaining to the Oaks of Loris, including that residents were not paying enough to run the facility and the property only housed 40 residents despite its capacity to house 60 residents. On May 3, 2023, the Board voted to close Oaks of Loris for renovations, and Debtor notified DHEC of its intent to close the assisted

living facility effective June 3, 2023.[18]  The Board also met with West Town Bank in May of 2023 to discuss the reasons why the loans were in default and request a workout.

On September 20, 2023, Hucks filed an interpleader action, Case No. 2023-CP-2605847 in Horry County (the "Interpleader Action"), seeking to deposit $305,505.47 with the clerk of court, which represented tax refunds or credit funds presented to Hucks relating to Debtor's operations.  The Interpleader Action has since been removed to the Bankruptcy Court.[19]  McLean testified that Debtor would be willing to use funds from the Interpleader Action to make adequate protection payments to Bank.

<u>**Foreclosure Actions and Bankruptcy Filing**</u>

On November 3, 2023, West Town Bank filed two foreclosure actions against Debtor in Horry County regarding the Loris Loan Mortgage and Murrells Inlet Mortgage:  (1) *West Town Bank & Trust f/k/a West Town Savings Bank v. Partners In Hope, Inc., a South Carolina Non-Profit Corporation, et al.,* Case No. 2023-CP-26-06861 (the "Loris Foreclosure"), and (2) *West Town Bank & Trust f/k/a West Town Savings Bank v. Partners in Hope, Inc., a South Carolina Non-Profit Corporation, et al.,* Case No. 2023-CP-26-06860 (the "Murrells Inlet Foreclosure").[20] In both Foreclosure Actions, Bank filed motions seeking summary judgment and the appointment of a receiver.  As West Town Bank stated in its Stay Motion, its intent was to have a receiver appointed to review Debtor's books and records, sell the inoperative Loris Property, and manage the Murrells Inlet Property while preparing it for a possible sale along with the assisted living facility business so that its residents could remain in place.[21]  Debtor's bankruptcy filing stayed the Foreclosure Actions prior to the entry of any orders on the summary judgment motions.

---

[18] Bank's Ex. I (Stay Motion).
[19] Adv. Pro. No. 24-80021-eg, ECF No. 1, filed Apr. 17, 2024.
[20] Bank Exs. Q and R (Cash Collateral Motion).
[21] ECF No. 22 at ¶ 18.

Prior to the Petition Date, Bank ordered appraisals of both the Loris Property and the Murrells Inlet Property to be prepared by Colliers International.  The appraisal report states that the total "as-is" market value of the Loris Property as of October 17, 2023 is $1,540,000.00.[22]  As for the Murrells Inlet Property, the appraisal report states that the "as is" market value of the Murrells Inlet Property as of August 31, 2023 is $1,750,000.00.[23]

West Town Bank filed its proofs of claim on March 29, 2024, asserting (a) a secured claim of $1,150,587.14 on the Loris Property, with arrearages of $245,054.27 and (b) a secured claim of $2,267,707.09 on the Murrells Inlet Property, with arrearages of $407,803.65.[24]  To date, USDA has not filed a proof of claim.[25]  The only other claims filed to date are claims by: (a) the South Carolina Department of Revenue in the amount of $1,905.39,[26] (b) the Internal Revenue Service in the amount of $327,562.74 (with $295,222.74 as a priority claim),[27] and (c) an unsecured claim of LEAF Capital in the amount of $27,178.46.[28]  Notably, Debtor's schedules filed with the Voluntary Petition indicate that ,aside from the USDA and West Town Bank debt, the only other secured creditor is Horry Electric Cooperative Inc. in the amount of $39,484.00.[29]  Schedule F reflects only one unsecured claimed owed to McLean Enterprises, LLC--another entity owned by McLean--in the amount of $984,740.00.

---

[22] The appraisal of the Loris Property was made considering the income approach, sales comparison approach, and cost approach.  The income and cost approaches were rejected because the characteristics of the subject property (specifically, the fact that the property was vacant and underperforming at the time of valuation) did not warrant use of this valuation methodology.  Ultimately, Colliers International applied the sales comparison approach to reach its conclusion of value for the Loris Property. Bank's Ex. G at 46-47 (Cash Collateral Motion).

[23] West Town Bank's appraisal of the Murrells Inlet Property was made considering the income approach, sales comparison approach, and cost approach.  The income and cost approaches were rejected because the characteristics of the subject property did not warrant application of those valuation techniques.  The sales comparison approach was ultimately applied to reach the conclusion of value for the Murrells Inlet Property. Bank's Ex. N at 48-49 (Cash Collateral Motion).

[24] Proof of Claim Nos. 3-1 and 4-1.

[25] The bar date for non-governmental creditors to file claims is July 18, 2024.

[26] Proof of Claim No. 1-1, filed Mar. 19, 2024.

[27] Proof of Claim No. 2-1, filed Mar. 20, 2024.

[28] Proof of Claim No. 5-1, filed Apr. 26, 2024.

[29] ECF No. 1.

**Financial Projections**

McLean testified that Capture Cares currently operates at a net loss, and it has no income separate and apart from the Inlet Oaks facility.  Inlet Oaks has 45 residents, some of whom pay low rental rates under agreements entered into with the prior management company, CSS.  Debtor's sole income for the Loris Property is the rental income from the HCCA under the lease set to expire in July of 2024.  McLean testified that as of October of 2023—the date of Colliers International's  appraisal of the Loris Property—the repairs to the facility required by DHEC were well on their way.  The Oaks of Loris suffered a further setback in January of 2024 when a sprinkler broke causing flooding on one side of the building.  That side was gutted, and new walls and insulation were installed.  As of the hearing date, McLean indicated that renovations to Oaks of Loris have been completed, and they are waiting for an appointment with DHEC to complete inspections so the facility can reopen.  McLean testified that some of the renovations to Oaks of Loris were funded by McLean Enterprises, LLC, one of her other entities, which contributed at least $400,000.00 to renovations.  However, no records supporting this testimony were introduced into evidence.

Prior to and during the course of the foreclosure proceedings, Bank requested books and records from Debtor, which were not provided primarily because Debtor and its prior management company failed to maintain accurate books and records and they had to be recreated.  Debtor and Capture Cares retained Newpoint to assist with the preparation of books and records, monthly operating reports, and plan projections.[30]  Debtor presented the testimony of Mark Ruday, Managing Director of Newpoint  Mr. Ruday examined the financial records of Capture Cares and

---

[30] Newpoint was retained and was paid a retainer of $35,000.00, $25,000.00 of which was paid post-petition by Capture Cares using funds from rental income from Inlet Oaks.  The payment of the retainers was not disclosed initially by the firm.  After a hearing, on May 7, 2024, the Court entered an order requiring Newpoint to return those funds to Debtor and to file fee applications for any fees incurred after the date of its retention.  ECF No. 71.

Debtor and created books and records for both entities. He also performed a "fully loaded" cash flow analysis of Capture Cares' operations and prepared a 37-week projections for both the Loris Property and the Murrells Inlet Property, spanning from April 15, 2024 through the end of 2024.[31] He testified that the Inlet Oaks facility is in a negative cash flow position and if the Oaks of Loris does not reopen, Capture Cares cannot make a full monthly payment to West Town Bank and USDA for the debt service on that property, which is approximately $44,000.00. Mr. Ruday stated that if Oaks of Loris reopens and has an acceptable census of at least 55 residents, it would not be profitable until October of 2024. He stated his belief that Capture Cares could pay between $15,000 - $22,000 per month but acknowledged that neither West Town Bank nor USDA has indicated that they would accept anything less than the full amount of the payment. Based on his discussions with DHEC and his knowledge of the industry, Mr. Ruday indicated that he believed it would take at least 60 days to reopen Oaks of Loris and his financial projections were therefore based upon a July 1, 2024 possible opening date.

## CONCLUSIONS OF LAW

The validity, perfection, priority, and amount of West Town Bank's claim related to the Loris Loan Agreement and Murrells Inlet Loan Agreement is not disputed. West Town Bank seeks relief from the automatic stay pursuant to both 11 U.S.C. §§ 362(d)(2) and (d)(1) in order to resume the Loris Foreclosure. West Town Bank does not seek relief from stay on the Murrells Inlet Property. For the reasons set forth below, West Town Bank's motion is granted under 11 U.S.C. § 362(d)(2).[32]

---

[31] Debtor Ex. 4.

[32] Because the Court finds that the elements of 11 U.S.C. § 362(d)(2) are met, it will not address the alternative grounds of section 362(d)(1) under which West Town Bank also sought relief.

## I.      Relief from the Automatic Stay – 11 U.S.C. §§ 362(d)(2)

Section 362(d)(2) provides that relief from stay shall be granted if the party requesting such relief demonstrates that "the debtor does not have an equity in such property; and such property is not necessary to an effective reorganization."  The party requesting relief from the automatic stay has the burden of proof on the issue of equity and the party opposing such relief has the burden on all other grounds. 11 U.S.C. §§ 362(g); *see also In re Morgan*, 630 B.R. 476, 479 (Bankr. D.S.C. 2021) (citing 11 U.S.C. § 362(g); *In re Toomer*, C/A No. 10-07273-JW, 2011 WL 8899488, at *2 (Bankr. D.S.C. Oct. 5, 2011)).  Once the creditor has demonstrated that there is no equity in the property, the burden shifts to the debtor to demonstrate that the property is necessary for an effective reorganization.  *See In re Morgan*, 630 B.R. at 479.

*A. West Town Bank Has Met Its Burden to Prove There is No Equity in the Loris Property*

West Town Bank asserts there is no equity in the property securing Debtor's obligations under the Loris Loan Agreement.  West Town Bank presented into evidence an appraisal conducted by Justin Butler, the Managing Director of Healthcare Valuation of Colliers International ("Colliers"), which states that the total "as-is market value" of the Loris Property as of October 17, 2023 is $1,540,000.00.[33]  The total amount owed under West Town Bank's loan and USDA's loan on the Loris Property is currently $7,225,245.70.[34]  West Town Bank's appraisal took into account both the valuation of Horry County Tax Assessor and the fact that the facility's license had been revoked by DHEC in June of 2023 due to several issues, including presence of mold and insects inside the facility.[35]  The testimony at the hearing indicated that the Loris Property

---

[33] Bank's Ex. G (Stay Motion). At the hearing, counsel for Debtor raised an objection with respect to the appraisal, which was overruled based upon her prior stipulation to its admissibility in the Joint Statement of Dispute.

[34] The parties do not appear to dispute the amount of the mortgage debt on the Loris Property.  In the Joint Statement of Dispute, Debtor stated that the total mortgage debt on the Loris Property is $7,640,587.14. ECF No. 52.

[35] Bank's Ex. G, pp. 4 and 7 (Cash Collateral Motion).

remains vacant, and the only income that property generates is approximately $1,390.00 per month from the HCCA.  It is unclear whether that rental income will continue past July of 2024, when the lease with the HCCA terminates.

Debtor challenges West Town Bank's valuation on the grounds that it is based on a non-operating facility in disrepair.  Although Debtor has represented to West Town Bank multiple times over the past few months that the facility is on the brink of reopening, West Town Bank contends that there is no evidence that reopening of the Oaks of Loris is in fact imminent.  Other than the testimony of McLean, Debtor has presented no documentation to support that the renovations to the facility are complete or that the license from DHEC to operate a second assisting living facility Loris Property is indeed impending.  To the contrary, at the hearing held on March 27, 2024 for the appointment of a patient care ombudsman, Debtor's counsel indicated that it was expected that the Loris Property would reopen on April 15, 2024.  Unfortunately, that has not materialized, and the evidence presented indicates that there is no date set as to when DHEC will even inspect the property, which is a prerequisite for the facility to reopen.  Even if it were to reopen by the summer, there is no concrete evidence that it would be fully operating and occupied by October of 2024.

Debtor claims in its Schedules that the Loris Property is worth $12 million and the Murrells Inlet Property is worth $12.5 million.  As a member of Debtor's Board, McLean testified she believed the Loris Property is worth around $8 million.  Her opinion of value was based primarily upon an unsigned and undated opinion provided by The Lighthouse Group LLC ("Lighthouse Opinion"), which Debtor presented into evidence without objection.  McLean's opinion of value was based also upon the funds that have been contributed by entities she owns towards the improvement of the Loris Property.  As stated earlier, no concrete evidence of the amount of funds

contributed by these entities was offered.[36]  McLean testified that she received the Lighthouse Opinion about two weeks ago, but no testimony was presented as to when the valuation was conducted.  The Lighthouse Opinion relies upon information from the Horry County Tax Assessor's Office,[37] and appears to apply the income approach and cost approach for valuation. The Lighthouse Group LLC determined that the Loris Property is worth $8,873,210.56.

The Court has reservations regarding both parties' evidence of value of the Loris Property. More than six months has passed since Colliers Internationals conducted its appraisal, and it is unclear what improvements have been made since, which may impact the value of the Loris Property.  It further appears that West Town Bank's appraiser did not conduct a visual inspection of the interior of the building, relying solely upon online photographs of the Property.  The Lighthouse Opinion, on the other hand, is not reliable as it is undated and there is no evidence regarding when the appraisal was conducted, who prepared it, and whether the individual who offered the opinion was qualified to offer such valuation.  It relied upon the Income Approach Method, despite the fact that the Oaks of Loris facility is not operating, as well as the Cost Approach Method (*i.e.*, the cost to replace a commercial facility on this location).  The Lighthouse Opinion was also based upon Horry County tax records.  It is unclear from the Lighthouse Opinion how the ultimate conclusion of value was calculated, as it states that the fair market value according to tax records is $8,315,580.00, the net income of the Loris Property is estimated to be

---

[36] ECF No. 1. Official Form 204 (List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders) includes an unsecured claim owed to Mclean Enterprises, LLC in the amount of $984,740.00.  Schedule E/F lists a nonpriority claim of $984,740.00 owed to Mclean Enterprises, LLC.

[37] The Loris Property is comprised of two parcels of real property.  The Horry County Tax Assessor records for the parcel containing the assisted living facility indicate that the taxable value of the land is $195,450.00 and taxable value of the improvements is $4,730,368.00, for a total taxable value of $4,925,818.00. Debtor's Ex. 1. The Tax Assessor records further indicate a total "market value" of $6,929,650.00.  The records for the second parcel containing the building presently leased to HCCA indicate that the taxable value of the land is $299,200.00 and the taxable value of the improvements is $635,750.00, for a total value of $934,950.00.  The total "market value" for the second parcel is listed as $1,169,300.00.  The two parcels combined together would have a taxable combined value of $5,860,768.00 and "market value" of $8,098,950.00.

$511,949.56, and the replacement cost was stated as $8,362,170.00, but the conclusion of value is
$8,873,210.56.   The Income Approach method was rejected by West Town Bank's appraiser
because the facility is not operating as a going concern.   The Lighthouse Opinion further indicates
that its "Income Approach" is based upon 2024 monthly projections "attached thereto", but no
projections are attached.   While the Lighthouse Opinion calculated a replacement cost of
$8,362,170.00, West Town Bank's appraiser concluded the replacement cost was $4,990,000.00.
Neither party presented the testimony of the individuals who prepared their respective reports.   The
Court does not place significant weight on the county tax assessment that Debtor introduced into
evidence because it is unclear from the tax records when the Loris Property was last assessed, how
the "market value" was determined, and whether the valuation was based upon the property being
occupied or vacant.

There is a disparity of more than $7 million between the parties' respective valuations of
the Loris Property.   The actual value of the Property likely falls somewhere in between the parties'
opinions of value, but the Court finds that the value is closer to the lower end of the valuation
range.   Valuation is not an exact science, and the Court is not bound to accept the values contained
in the parties' appraisals.   *In re Hayes,* 657 B.R. 519, 528 (citing *In re Levin,* No. 8-17-77330,
2020 WL 1987783, at *3 (Bankr. E.D.N.Y. Apr. 24, 2020)).   The Court, however, finds that West
Town Bank's valuation of the Loris Property is more reliable than the evidence of value presented
by Debtor.   West Town Bank's appraisal was conducted by a reputable appraisal company and
applied the sales comparison approach, which the Court finds is a reliable appraisal methodology
for property that is not presently operating as a going concern.[38]   Even if the value of the mold
remediation was added into the West Town Bank's valuation, it would not increase the value of

---

[38] "A commercial enterprise is a going concern if it is actively engaged in business with the expectation of indefinite
continuance." *In re Quick Cash, Inc.,* 620 B.R. 358, 363-64 (Bankr. D.N.M. 2020) (citing cases).

the Loris Property by more than $5 million.  McLean's opinion of value of the Loris Property carries little weight because she stated it was based upon the Horry County tax records and Lighthouse Opinion.

Based on the evidence presented, the Court concludes there is no equity in the Loris Property, as the evidence reflects that the Property is worth less than $7,225,245.70.

### B. Debtor Has Not Met Its Burden to Prove that the Loris Property Is Necessary to an Effective Reorganization

Debtor asserts that the Loris Property is necessary to its reorganization.  The United States Supreme Court has stated that the second element for relief from stay under § 362(d)(2)(B) requires a demonstration "that the property is essential for an effective reorganization that is in prospect. This means . . . there must be a *reasonable possibility* of a successful reorganization within a *reasonable time*." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 375-76 (1988) (internal quotations omitted) (emphasis added).  Debtor carries the burden of proof on this issue and must prove that "a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed." *In re Washington,* No. 14-05589-DD, 2015 WL 890981, at *3 (Bankr. D.S.C. Feb. 26, 2015) (quoting *John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Assoc.,* 987 F.32d 154, 157 (3d Cir. 1993)).

It is undisputed that Debtor has made no payments to West Town Bank since December of 2022.  Its monthly payment obligation to West Town Bank alone on the Loris Property is $8,990.00.  Under ordinary circumstances, Debtor would be entitled to income generated by the Loris and Murrells Inlet Properties, but its lease agreement with Capture Cares does not provide for it to receive any income, as it requires Capture Cares to pay the loans directly to West Town Bank and USDA.  The only income coming into Debtor's account from the Loris Property at this time is the $1,390.00 per month payment from HCCA, but the continuation of that income stream

is questionable at best, as the lease is set to expire in July and no evidence was introduced that it will be extended or renewed.  McLean testified that Debtor's Board contemplated opening a hospice house in the building currently occupied by HCCA if the lease is not renewed. She did not anticipate that costs to renovate the space for a hospice house would be required, unless DHEC would require renovations, but indicated that there would be a fee for the license to operate a hospice house.  McLean further stated that Debtor has not yet obtained approval from DHEC to operate a hospice house because they have only recently learned that HCCA may not renew the lease.  Moreover, there is no concrete evidence of what the income from that property would be if the facility was opened as a hospice house.

What is clear at this point is that the Oaks of Loris facility is not currently operating and there is no date certain—or even a tentative date—as to when it will reopen.  While Debtor's attempts to reopen the assisted living facility with the hope of achieving profitability and an ultimate sale are admirable—especially given the nature of the business and the genuine good faith intentions of the Board as evidenced by McLean's testimony--the only certainty at this time is the uncertainty of when the facility will be operational again or when it will even be inspected by DHEC, which is the necessary first step to its possible resumption of operations.  The reputation of the Oaks of Loris facility has been tarnished by news reports regarding the conditions of its facilities, and it appears overly optimistic to assume that the facility will return to full occupancy within three months of reopening.[39]

Debtor indicated that to reorganize it would rely upon income from (1) the Interpleader Action (estimated to be $304,000.00), (2) recovery from forensic investigation of former

---

[39] No historical data was provided regarding the income from the Loris Property.  The tax returns for 2022 indicated significant losses.  The absence of historical data demonstrating earnings potential causes the Court to question the dependability of the projections.

accountant through insurance (estimated to be approximately $200,000.00), and (3) the sale of the

Loris and Murrells Inlet Properties.  Worrell testified that even if the forensic analysis could be

completed with an additional 20 hours of work, once his report is concluded there would have to

be a civil or criminal suit brought to possibly recover any funds.  He further testified that he had

identified questionable transfers of approximately $150,000-$200,000, but there was no guarantee

that funds would be recovered, as it was possible that a plausible explanation could be provided

for the transfers.  As to the Interpleader Action, it was recently removed from state court to this

Court, and it appears that Hucks, the alleged malfeasor, came into possession of tax refunds or

credit refunds which were then deposited to with the state court as they were believed to be due to

the various defendants named in the complaint.  Debtor has brought a motion for judgment on the

pleadings, which has not yet been heard by the Court. At this point, it is unclear whether the subject

funds are cash collateral of the secured creditors or whether the estate would benefit from those

funds.[40]  During the hearing, Debtor's counsel indicated that she had received an offer to purchase

the Loris Property on the night before the hearing but presented no proof of the offer or its terms

to the Court.

The determination to grant relief from stay at this stage in the case is a difficult one,

especially considering the apparent need for the services provided by these facilities in their

respective communities.  The Court appreciates Debtor's commitment to making these facilities

survive, but the path forward for the Loris Property at this point appears to hinge solely on hopes

without any credible assurance of success in the near future.  For these reasons, the Court finds

that Debtor has failed to meet its burden of demonstrating that the Loris Property is essential for

an effective reorganization that is in prospect.  Therefore, upon the record before it and after careful

---

[40] Notably, one of the defendants in that action is Horry County Cooperative Inc., who is listed on Debtor's Schedule
D as having a secured claim in the amount of $39,484.00.

consideration of the evidence and testimony presented, West Town Bank is entitled to relief from stay as to the Loris Property pursuant to 11 U.S.C. § 362(d)(2).

## II.    Motion to Prohibit Debtor's Use of Cash Collateral

West Town Bank also requests that the Court prohibit Debtor and/or Capture Cares from using its cash collateral.  In the alternative, West Town Bank requests that it be given adequate protection and an accurate accounting of all rents received by Debtor, Capture Cares, and any other company.  From the outset, the Court notes that USDA—whose claim is almost three times as much as West Town Bank's claim—has not sought relief from stay, requested adequate protection, or moved to prohibit use of cash collateral.

The use of cash collateral in the ordinary course of business is governed by 11 U.S.C. § 363(c).  Section 363(c)(1) allows a debtor in possession to use property of the estate in the ordinary course of business without notice or a hearing, subject to § 363(c)(2), which provides that the debtor in possession may not use, sell, or lease cash collateral under § 363(c)(1) unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  If a creditor does not consent to the use of cash collateral, its use may be granted only to the extent that the court determines that the creditor's interest in the collateral is adequately protected.  *See* 11 U.S.C. § 363(e).  Debtor has the burden of proof on adequate protection under 11 U.S.C. § 363(p). Adequate protection can be met by providing one of the options under 11 U.S.C. § 361:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

Debtor disputes that the rents received by Capture Cares from the tenants at the Murrells Inlet Property constitute cash collateral. Even if the rents are cash collateral, Debtor contends that West Town Bank is adequately protected by equity in the Murrells Inlet Property and further asserts that a replacement lien and adequate protection payments would serve as adequate protection for West Town Bank's interest in the post-petition rents. Debtor further argues that the Cash Collateral Motion is also premature.

The extent of a creditor's security interest in collateral is determined by looking at the totality of the language in the security agreement to determine the parties' intent. *See In re Madawaska Hardscape Products, Inc.,* 476 B.R. 200, 209 (Bankr. S.C. 2012). Here, the Murrells Inlet Loan Agreement provides, among other things, that Debtor grants a security interest in and to the "Collateral",[41] including "Accounts Receivable,"[42] which is further defined to include "any and all accounts . . . of [Debtor] and each and every right of [Debtor] to (i) the payment of money. . . ."[43] The Murrells Inlet Mortgage provides that as Mortgagor, Debtor does "hereby grant, bargain, sell, convey, mortgage and warrant to Mortgagee [West Town Bank] and its successors and assigns forever the Real Property, and all of the Mortgagor's estate, right, title and interest therein, together with the following described 'Other Property': . . . (d) All *rents*, issues, deposits and profits accruing and to accrue from the Real Property and Other Property and the avails

---

[41] Bank's Ex. H, at § 3.01 (Cash Collateral Motion).
[42] *Id.* at § 1.01(J)
[43] *Id.* at § 1.01(B).

thereof."[44]  In Section 2.05, the Mortgage further provides that "Mortgagor hereby assigns, transfers and sets over unto Mortgagee *all the rents, fees or payments now or hereafter due, under or by virtue of any lease* or other agreement, whether oral or written, or any letting of, or any agreement for the use or occupancy of any part of the Property . . . ."[45]  West Town Bank never approved the arrangement between Debtor and Capture Cares whereby the latter would be responsible to collect the rents and pay the loan directly to the banks.  Debtor failed to articulate a plausible argument as to why the rents that Capture Cares—an insider[46]—receives are not West Town Bank's cash collateral.

The *In re City Loft Hotel, LLC* case is factually similar to this case.  *In re City Loft Hotel, LLC,* 465 B.R. 428 (Bankr. D.S.C. 2012).  Like the debtor in *City Loft,* Debtor is the owner of real property and the buildings located on that real property but has a separate entity operating a business on the property and receiving its income.  As described above, West Town Bank has a lien on the Loris and Murrells Inlet Properties and an assignment of rents.  Therefore, any revenue generated by the property is West Town Bank's cash collateral.  By virtue of its management agreement, Debtor has redirected its income by requiring Capture Cares to pay its rent directly to West Town Bank.  In *City Loft*, the Court held that because the bank had a lien on the property and an assignment of rents, the revenue generated by the property was the bank's cash collateral.  The Court concluded that "this result cannot be circumvented by the formation of an additional

---

[44] Bank's Ex. J, at § 2.01 (Cash Collateral Motion).

[45] *Id.* at § 2.05. Section 552(a) of the Bankruptcy Code generally cuts off a secured creditor's security interest in cash collateral generated post-petition and therefore, the offer of a replacement lien on cash collateral generated post-petition can adequately protect a creditor's interest.   "However, a prepetition security interest in rents of property subject to a security agreement entered into prior to the petition date continues in full force and effect post-petition by virtue of § 552(b) of the Bankruptcy Code." *In re Smithville Crossing, LLC*, No. 11-02573-8, 2011 WL 5909527 (Bankr. E.D.N.C. Sept. 28, 2011) (quoting *In re Union-Go Dairy Leasing, LLC*, No. 10-01703-11, 2010 Bankr. Lexis 1468, * 10 (Bankr. S.D.Ind. May 6, 2010).

[46] Capture Cares is in essence an "insider" of Debtor but not itself in bankruptcy.   *See* 11 U.S.C. §§ 101(31)(E), 101(31)(F), and 101(2)(D).

entity and the diversion of income from City Loft without any agreement." *Id.* at 434.  Accordingly, the Court prohibited the debtor from any further use of the bank's cash collateral.

Debtor asserts that *City Loft* is distinguishable from this case because there was no management agreement between the debtor and additional entity.  The Court finds that to be a distinction without a difference.  McLean testified that until Capture Cares began to manage both facilities in January of 2023, all rents were paid into Debtor's accounts and all expenses were paid by Debtor.  West Town Bank was unaware that the residents of the facilities had been directed to pay all rents to Capture Cares and was unaware of the terms of the leases and management agreement with Capture Cares.  Debtor itself indicated that it intended to file a motion to use cash collateral under "a specified budget."[47]  Based on the foregoing language in the Loan Agreement and Mortgage and the facts and evidence before it, the Court concludes that the rents are cash collateral under the terms of the parties' agreement.  The Court acknowledges the unusual predicament Debtor finds itself in as it entered into a lease with an insider entity which entitles Capture Cares to the income from the assisted living facility.  However, in this atypical situation and given the Court's conclusion based on the evidence presented and record before it that the income from the residents is indeed cash collateral, the Court will require oversight of the budget and how the funds are being used.  To date, Debtor has not sought permission to use the funds, and while it submitted an exhibit into the record prepared by Newpoint setting forth the 37-week cash flow projections, no authority was sought to spend the funds as proposed therein.

Debtor argues that the Cash Collateral Motion is premature because it has been in bankruptcy for only seven weeks—now close to nine weeks—and Debtor should have the opportunity to attempt to propose a feasible Plan.  Unlike the Loris Property, which is not an

---

[47] ECF No. 31 at ¶ 44. (Objection to Motion of West Town Bank to Prohibit Debtor's Use of Cash Collateral and/or for Adequate Protection).

operating assisted living facility, the Court is sensitive to the fact that the Inlet Oaks facility currently has 45 live-in residents who rely on the services provided. The patient care ombudsman's report does not raise any current concerns regarding the safety and well-being of the residents.[48] Debtor acknowledges that the path forward for the Murrells Inlet Property is a sale of the business as a going concern, and the Court is mindful and cognizant that the sale of the Murrells Inlet Property in bankruptcy as a going concern may result in a higher sale price—to the benefit of Debtor's creditors, including West Town Bank—than a quick sale in state court through foreclosure.

West Town Bank argues that there is no equity cushion in the Murrells Inlet Property offering it protection. As set forth above, the total amount of the secured debt on the Murrells Inlet Property is $8,304,260.00. West Town Bank presented an appraisal of the Murrells Inlet Property, prepared by Justin Butler with Colliers, dated October 20, 2023, which determined that its "As Is Market Value" was $1,750,000.00 as of August 21, 2023, using the Sales Comparison Approach. Debtor presented an opposing appraisal from The Lighthouse Group, LLC, which determined that the fair market value of the Murrells Inlet Property was $11,303,320.00, using a Cost Approach to valuation ("Inlet Oaks Appraisal").[49] The Inlet Oaks Appraisal is unsigned, undated, and indicates that 2024 Monthly projections are attached to Valuation, but none are attached. Debtor also introduced the valuation of the Horry County tax assessor which reflects the property as having a taxable value of $5,199,610.00 and a market value of $5,885,440.00. As with the valuations both parties offered into evidence for the Loris Property, the opposing valuations provided for the Murrells Inlet Property present similar concerns. Notably, however, the Court finds that the Colliersvaluation of the Murrells Inlet Property presented by West Town Bank is not as reliable as

---

[48] ECF No. 58, filed Apr. 30, 2024.
[49] Bank's Ex. N (Cash Collateral Motion).

Debtor's as it does not provide a value of the business as a going concern, which would undoubtedly result in a higher value. Accordingly, the Court is not prepared to find that there is no equity cushion in the Murrells Inlet Property to protect West Town Bank's interest. Moreover, there is no indication that the value of the real estate is decreasing in value. Debtor has also indicated its willingness to pay adequate protection starting at $5,000.00 per month, to be possibly increased when Inlet Oaks, which currently houses 45 residents, reaches its capacity of 60 beds. Accordingly, the Court finds that Debtor has met its burden of proof under 11 U.S.C. § 363(p).

Section 363(e) provides that:

Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit *or condition* such use, sale, or lease as is necessary to provide adequate protection of such interest. . . .

11 U.S.C. §363(e) (emphasis added). Given the early stages of the bankruptcy case, the nature of the business, and the evidence before it as a whole, the Court will not prohibit the use of the cash collateral, but conditions its use as follows:

1. By May 20, 2024, Debtor shall provide West Town Bank with an accurate accounting of all rents received by Debtor, Capture Cares, and any other company that may be operating at either the Loris Property or the Murrells Inlet Property.

2. By May 20, 2024, Debtor shall remit to West Town Bank the amount of $5,000.00 as adequate protection and shall pay West Town Bank the sum of $5,000.00 on the 20th of every month (unless the date falls on a weekend or holiday, in which case payment shall be remitted the following business day) beginning June 20, 2024, until further order of the Court.

3. By no later than May 24, 2024, Debtor shall file a motion seeking authority to use cash collateral and seek a timely hearing for its approval.

4. The Court will hold a status conference **on June 4, 2024 at 2:00 p.m. at the J. Bratton Davis United States Bankruptcy Courthouse, 1100 Laurel Street, Columbia, SC 29201**, so that Debtor and West Town Bank can provide an update on the status of the case.

5.  Nothing herein prohibits either party from requesting that the amounts of the adequate protection as set forth herein be altered so as to provide West Town Bank adequate protection of its interest in the collateral securing its loan.

## <u>CONCLUSION</u>

For the reasons set forth above, West Town Bank's Motion for Relief from Stay is granted and its Motion to Prohibit Use of Cash Collateral is denied upon the conditions set forth above.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**05/15/2024**



Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

Entered: 05/15/2024