## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

|  |  |
|---|---|
| IN RE:<br><br>Partners In Hope, Inc.,<br><br>Debtor(s). | C/A No. 24-00935-EG<br><br>Chapter 11<br><br>**AMENDED ORDER DISMISSING CASE AND REMANDING**[1] |

**THIS MATTER** is before the Court on the United States Trustee's Motion to Dismiss Case filed on May 24, 2024 (the "Motion to Dismiss").[2]  Partners In Hope, Inc. ("Debtor") filed an objection to the Motion to Dismiss.[3]  A contested hearing was held on July 9, 2024, which was attended by Debtor's representative, Terry McLean ("McLean"); Debtor's counsel; counsel for the United States Trustee ("UST"); and counsel for West Town Bank & Trust f/k/a West Town Savings Bank ("West Town Bank").[4]  The parties stipulated to the admissibility of various exhibits into the record.[5]  The Court also heard testimony from McLean and Carin Sorvik, CPA ("Sorvik"), a representative of Debtor's financial advisor, Newpoint Advisors Corp ("Newpoint").

The Motion to Dismiss seeks the dismissal of Debtor's case pursuant to 11 U.S.C. § 1112(b)(1) and (4)(A).[6]  This Court has jurisdiction of this proceeding under 28 U.S.C. §§ 1334 and 157 and this motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).  After

---

[1] This Order is being amended to clarify that Adv. Pro. No. 24-80021 is being remanded to the Horry County Court of Common Pleas.

[2] ECF No. 94.

[3] ECF No. 101, filed May 31, 2024.

[4] At the hearing, counsel for West Town Bank stated that it was not taking a position on the Motion to Dismiss.

[5] UST's Exhibits A-M and Debtor's Exhibits 1-6 were admitted by stipulation.  Debtor also presented an additional exhibit (Exhibit 7) during Sorvik's testimony, which was admitted without objection.

[6] In the Motion to Dismiss, the UST also sought dismissal under 11 U.S.C. §§ 1112(b)(4)(B), (F), and (H).  However, in the Joint Statement of Dispute and Stipulation filed July 7, 2024 (ECF No. 151), the UST stated that it was no longer seeking dismissal under those subsections.

a thorough review of the evidence presented, the arguments of the parties, and the entire record

before it, the Court makes the following findings of fact and conclusions of law.[7]

## FINDINGS OF FACT

Debtor is a non-profit corporation organized under the laws of the State of South Carolina

on November 18, 2009.  On March 13, 2024 (the "Petition Date"), Debtor filed for relief under

Chapter 11 of the Bankruptcy Code.[8]  To date, it has remained in possession of its property and

continues to operate its business pursuant to 11 U.S.C. §§ 1107 and 1108.  Debtor is the owner of

real property in Loris, South Carolina ("Loris Property")[9] and in Murrells Inlet, South Carolina

("Murrells Inlet Property").  Debtor has no other business operations beyond being the owner and

landlord of the Loris and Murrells Inlet Properties.

Capture Cares Assisted Living, LLC ("Capture Cares") presently operates an assisted

living facility at the Murrells Inlet Property, known as Inlet Oaks, under a Management and

Operating Agreement (the "Management Agreement") with Debtor.  Capture Cares also

previously operated an assisted living facility at the Loris Property—Oaks of Loris—but closed

the facility in June of 2023 after the South Carolina Department of Health and Environmental

Control ("DHEC") revoked the facility's license due to unclean and unsafe conditions.  As of the

date of the hearing, the Oaks of Loris facility remains closed.  The Loris Property has another

building on the land owned by Debtor, which is leased to Horry County Council on Aging

---

[7] The Court previously issued an Order granting West Town Bank's Motion for Relief from Stay on the Loris Property
and denying the bank's motion to prohibit use of cash collateral on various conditions (the "May 15 Order") (ECF
No. 77).  *See In re Partners In Hope, Inc.*, No. 24-00935, 2024 WL 2730378 (Bankr. D. S.C. May 15, 2024).  In the
May 15 Order, the Court made various findings of fact and conclusions of law, which are fully adopted and
incorporated herein.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted
as such, and vice versa.
[8] ECF No. 1.
[9] The Loris Property includes real property located on two separate but adjacent lots.

("HCCA") for approximately $1,400.00 per month.   The lease to HCCA is scheduled to expire on July 31, 2024.

Debtor's representative, McLean, is a member of Debtor's board of directors.  She is also the owner/operator of Capture Cares, as well as multiple other entities, including Capture Inc., Capture Child Development Center, Terry McLean Ministries, Inc., and McLean Enterprises, LLC, among others.

### Loris and Murrells Inlet Property Loans

Both the Loris Property and Murrells Inlet Property are subject to mortgages held by the United States Department of Agriculture ("USDA") and West Town Bank. West Town Bank and the USDA executed an Intercreditor Agreement, whereby the parties acknowledged the loans extended to Debtor are secured by the two real estate properties and all personal property owned by Debtor and agreed that each of their liens would rank *pari passu* with the other, with each bank's percentage share of the lien position equal to the proportion of their outstanding debt as compared to the total amount of the outstanding mortgages.

West Town Bank filed proofs of claim on March 29, 2024, asserting (a) a secured claim of $1,150,587.14 on the Loris Property, with arrearages of $245,054.27 and (b) a secured claim of $2,267,707.09 on the Murrells Inlet Property, with arrearages of $407,803.65.[10]  To date, USDA has not filed a proof of claim.  According to the testimony of West Town Bank's representative at the hearing held on May 2, 2024, the amount owed under the USDA loan on the Loris Property is $6,074,658.56, for a total outstanding balance of $7,225,245.70, including West Town Bank's claim.  Moreover, according to Debtor, the amount owed to USDA on the loan for the Murrells

---

[10] Proof of Claim Nos. 3-1 and 4-1.

Inlet Property is $6,036,553.00, for a total outstanding balance of $8,304,260.00, including West Town Bank's claim.[11]

Both properties have been leased to Capture Cares since January of 2023 (the "Lease Agreement").[12] Debtor and Capture Cares also entered into the Management Agreement whereby Capture Cares was to manage and operate the assisted living facilities on Debtor's properties.[13] Under the terms of the Lease Agreement and Management Agreement, Capture Cares is entitled to all income and receivables resulting from the operation of the assisted living facilities; in turn, Capture Cares is obligated to pay rent equivalent to the mortgage payment for each property directly to West Town Bank and the USDA on Debtor's behalf.[14]

### Debtor's Board & Management History

As of December of 2022, the business operations on the Loris Property and Murrells Inlet Property were managed by Coastal Senior Solutions, LLC ("CSS"). On December 7, 2022, Debtor held an emergency meeting at the request of CSS to discuss allegations of financial misconduct by CSS's co-owner and accountant, Tim Hucks. At the meeting, board members questioned Hucks about possible misappropriation of funds and presented him with evidence of the misappropriation. As a result, Hucks resigned from CSS, and Debtor's board of directors terminated the management contract with CSS. Following the resignation of three board members, the board elected McLean, Phillip McLean, and David Barilla as board members, in addition to the two remaining members,

---

[11] At a prior hearing held on May 2, 2024, West Town Bank's representative testified that the payments due to West Town Bank are $8,990.00 per month for the Loris Loan Agreement and $17,948.00 per month for the Murrells Inlet Loan Agreement; the payments due to USDA are $24,571.00 per month for the Loris Property and $25,512.00 per month for the Murrells Inlet Property.
[12] ECF No. 132, Ex. 1.
[13] ECF No. 100, Ex. 1.
[14] The Lease Agreement and Management Agreement were both entered into between Debtor and Capture Cares on January 24, 2023.

as well as new officers.  On December 12, 2022, the new Board adopted new bylaws and hired Capture Cares, owned by McLean, as its management company.

When Capture Cares took over the management of the Oaks of Loris and Inlet Oaks, it inherited numerous problems resulting from CSS's mismanagement of the properties.  CSS had failed to renew the DHEC license at the Loris Property, maintain that property, and pay its bills, including the mortgage payments.  CSS had entered into rental agreements with tenants at both the Oaks of Loris and Inlet Oaks facilities at rates that did not provide sufficient funds to run the facilities.  There were also significant mold issues at the Loris Property that required remediation.

On February 3, 2023, DHEC issued an administrative order revoking Debtor's license to operate Oaks of Loris as a community residential care facility because of numerous regulatory violations.  In March of 2023, the Board met to discuss the financial position, rent rolls, and maintenance of each property, and moved to attempt to sell the Murrells Inlet Property.  On May 3, 2023, the Board voted to close Oaks of Loris for renovations, and Debtor notified DHEC of its intent to close the assisted living facility effective June 3, 2023.  According to McLean, the Board subsequently began renovations to the Oaks of Loris facility, using funds from operations at the Inlet Oaks facility, and Debtor was unable to make its mortgage payments to USDA and West Town Bank during that period because there were insufficient funds available to make those payments.

**Bankruptcy Filing and Claims**

While some adequate protection payments have been made to West Town Bank since the Petition Date, neither Debtor nor Capture Cares have made debt service payments since December 2022.  On November 3, 2023, West Town Bank filed two foreclosure actions against Debtor in Horry County regarding the Loris Loan Mortgage and Murrells Inlet Mortgage.  In both

foreclosure actions, West Town Bank filed motions seeking summary judgment and the appointment of a receiver.  Debtor's bankruptcy filing on the Petition Date stayed the Foreclosure Actions prior to the entry of any orders on the summary judgment motions or appointment of a receiver.

Soon after Debtor filed for bankruptcy relief, the Court entered a consent order approving the appointment of the State Long Term Care Ombudsman as the health care ombudsman (the "Patient Care Ombudsman") in this case.[15] The Patient Care Ombudsman filed a report on April 30, 2024,[16] indicating that there were 43 residents in the Inlet Oaks facility and the interviewed residents reported no issues regarding their care.  As of the hearing, no further report has been filed by the Patient Care Ombudsman.[17]

In its bankruptcy schedules, Debtor listed assets of $25,564,052.34, consisting in large part of the real estate: The Loris Property is listed as having a current value of $12 million and the Murrells Inlet Property is listed as having a current value of $12.5 million.[18]  Against this backdrop, Debtor listed debts totaling approximately $17 million consisting of (a) secured debt of approximately $16 million (including the USDA and West Town Bank debt and a secured debt of Horry Electric Cooperative Inc. in the amount of $39,484.00)[19] and (b) one unsecured claimed owed to McLean Enterprises, LLC—another entity owned by McLean—in the amount of $984,740.00.

---

[15] ECF Nos. 18 and 19, entered on Mar. 27, 2024.
[16] ECF No. 58.
[17] Pursuant to 11 U.S.C. § 333(b)(2), an ombudsman shall file "not less frequently than at 60-day intervals" a report regarding the quality of patient care provided to patients of the debtor.  Accordingly, the second report is presently past due.
[18] ECF No. 1, at 11-12.
[19] ECF No. 1, at 9.

The only other claims filed to date, [20] aside from West Town Bank's, are claims by: (a) the South Carolina Department of Revenue in the amount of $1,905.39, (b) the Internal Revenue Service ("IRS") in the amount of $59,228.76 (with $26,888.76 as a priority claim), (c) LEAF Capital Funding, LLC in the amount of $27,178.46, (d) Performance Foodservice Company in the amount of $14,083.49, (e) Leverage Builders, LLC in the amount of $71,504.43, (f) Zurich American Insurance Company in the amount of $8,556.00, (g) Horry Electric Cooperative Inc. in the amount of $39,483.95, (h) Hill & Jordan, CPAs, LLC in the amount of $9,959.00, (i) M. Timothy Hucks, PA in the amount of $50,325.00,  and (j) Copeland Stair Valz & Lovell, LLC in the amount of $4,265.00. [21]

Debtor's three retained professionals have filed their first fee application covering the period from the Petition Date through the first part of June, seeking fees and expense of approximately $162,000.00 for their services. [22]

### Interpleader Action

On September 20, 2023, Hucks filed an interpleader action in Horry County (the "Interpleader Action"), seeking to deposit $305,505.47 with the clerk of court, which represented tax refunds or credit funds presented to Hucks relating to Debtor's operations.  The Interpleader Action has since been removed to the Bankruptcy Court and is currently pending before the Court. [23]  Debtor filed a Motion for Judgment on the Pleadings, which Plaintiff has opposed on an untimely basis. [24]  At a hearing on June 7, 2024, the Court continued the matter to correspond with

---

[20] The bar date for non-governmental creditors to file claims is the day of the entry of this Order.
[21] See Claims Register and Proofs of Claim Nos. 1 through 12.
[22] ECF Nos. 140, 141, and 144.  The hearing on the fee applications has yet to occur, but the United States Trustee filed an objection to the professionals' fees.  *See* ECF No. 147.
[23] Adv. Pro. No. 24-80021-eg, ECF No. 1, filed Apr. 17, 2024.
[24] Interpleader Action, ECF Nos. 8 and 18.

the date of the hearing on the UST's Motion to Dismiss, and at that hearing, the matter was further

continued until July 22, 2024.[25]

**<u>Relief From Automatic Stay as to Loris Property</u>**

Shortly after the Petition Date, West Town Bank filed a motion seeking relief from the

automatic stay ("Motion for Relief from Stay")[26] pursuant to 11 U.S.C. § 362(d)(2) and (d)(1) to

resume foreclosure solely on the Loris Property.  Debtor objected to the Motion for Relief from

Stay and a hearing was held on May 2, 2024.  The parties presented conflicting appraisals as

evidence of the value of the Loris Property—West Town Bank's appraisal reported a total "as-is"

market value of $1,540,000.00 as of October 17, 2023, while McLean, as Debtor's representative,

opined that the Loris Property was worth $8 million based upon an unsigned and undated appraisal

opinion prepared by The Lighthouse Group, LLC, which determined that the Loris Property was

worth $8,873,210.56.  Noting its reservations as to both parties' valuations, the Court found that

West Town Bank's appraisal was more reliable than Debtor's and thus concluded that the Loris

Property had no equity:

> There is disparity of more than $7 million between the parties' respective valuations
> of the Loris Property.  The actual value of the [Loris] Property likely falls
> somewhere in between the parties' opinions of value, but the Court finds that the
> value is closer to the lower end of the valuation range.

*See* May 15 Order, at 15.

Ultimately, the Court granted relief from stay pursuant to § 362(d)(1) as to the Loris

Property, concluding that West Town Bank had met its burden to prove there was no equity in the

property while Debtor had not met its burden to prove the property was necessary for a

---

[25] Interpleader Action, ECF Nos. 25 and 26.
[26] ECF No. 22, filed Mar. 29, 2024.

8

reorganization.[27] As of the hearing on the Motion to Dismiss, West Town Bank had not completed a foreclosure sale of the Loris Property but noted that it was scheduled for July 23, 2024.

### Motion to Prohibit Use of Cash Collateral

West Town Bank also filed a motion requesting that the Court prohibit Debtor's use of cash collateral ("Motion to Prohibit Cash Collateral"),[28] or, in the alternative, requesting that it be given adequate protection and an accurate accounting of all rents received by Debtor, Capture Cares, and any other company.  A hearing on the Motion to Prohibit Cash Collateral was also held on May 2, 2024.  From the outset, Debtor disputed that the rents received by Capture Cares from the tenants at the Murrells Inlet Property constitute cash collateral.  The Court disagreed, noting that by virtue of the Management Agreement, Debtor had redirected its income, unbeknownst to West Town Bank, by allowing Capture Cares to collect all rents and requiring it to pay its rent directly to West Town Bank.[29]  Based on the record before it, including the language in the loan agreements and mortgage documents, the Court concluded that the rents are cash collateral subject to the security agreement with West Town Bank.[30]

Turning to the issue of the equity in the Murrells Inlet Property, the Court noted that the total amount of the secured debt on that property is $8,304,260.00.  The Court was presented with conflicting appraisals: (1) West Town Bank's appraisal estimating that, using the sales comparison approach, the value of the Murrells Inlet Property as of October 20, 2023, was $1,750,00.00, and (2) Debtor's unsigned, undated appraisal from The Lighthouse Group, LLC, which determined that the fair market value of the Murrells Inlet Property was $11,303,320.00.  Debtor also introduced the valuation of the Horry County tax assessor which reflects the property as having a

---

[27] ECF No. 77.
[28] ECF No. 28, filed Apr. 6, 2024.
[29] May 15th Order, at 21.
[30] *Id.*

taxable value of $5,199,610.00 and a market value of $5,885,440.00. Given the conflicting valuations, the Court was not prepared, based on the evidence before it, to conclude there was no equity cushion in the Murrells Inlet Property. It did, however, note that there was no indication that the value of the real estate was decreasing in value and found that Debtor's willingness to pay adequate protection starting at $5,000.00 per month tipped the scales in favor of denying the Motion to Prohibit Cash Collateral on the condition that, among other things, Debtor pay West Town Bank $5,000.00 per month as adequate protection, and that Debtor file a motion seeking authority to use cash collateral by no later than May 24, 2024.[31]

At the May 2, 2024 hearing, McLean testified that Capture Cares operates at a net loss and has no income separate and apart from the Inlet Oaks facility. She explained that she frequently transferred funds from other entities she owns to pay the bills for Inlet Oaks. As of that time, Inlet Oaks had 45 residents. Debtor also presented the testimony of Mark Ruday, Managing Director of Newpoint, Debtor's retained financial advisor, who performed a cash flow analysis of Capture Cares' operations and prepared 37-week projections for both the Loris Property and the Murrells Inlet Property, spanning from April 15, 2024 through the end of 2024 (the "May 2nd Budget"). He testified that the Inlet Oaks facility is in a negative cash flow position and if the Oaks of Loris does not reopen, Capture Cares could not make a full monthly payment to West Town Bank and USDA for the debt service on the Murrells Inlet Property, which is approximately $44,000.00. The May 2nd Budget accounts for adequate protection payments increasing from $5,000.00 the week of April 29, 2024 to $10,000, then $15,000 and eventually $40,000 in the subsequent months. The 37-week cash flow analysis reflected in the May 2nd Budget paints a gloomy picture for the Inlet Oaks facility, reflecting cumulative collections by the end of 2024 of $1,256,588.00 and total

---

[31] *Id.* at 24.

disbursements of $1,414,870.00, thus resulting in an overall negative cash flow of $(158,282.00).[32]
Notably, the projected collections assume an increase of 8 tenants in the Inlet Oak facility by July 1, 2024, for a total of 53 residents.  Based on the testimony presented at the hearing on the Motion to Dismiss, however, the projected increase in residents has not materialized.

### Motion for Use of Cash Collateral and Lease Rejections

Pursuant to the holding in the May 15 Order, Debtor filed a Motion for Interim and Final Order Pertaining to Use of Cash Collateral (the "Cash Collateral Motion") on May 24, 2024.[33] Debtor also filed a Motion to Reject Executory Contract (Capture Cares Assisted Living LLC),[34] Motion for Order Approving the Rejection of Lease (LEAF Capital Funding, LLC),[35] and Motion for Order Approving the Rejection of Lease (Capture Cares Assisted Living, LLC).[36]  In the Cash Collateral Motion, Debtor indicated that the Motions to Reject Executory Contract and Lease with Capture Cares were filed as a result of the May 15 Order.  Debtor conceded in that Motion that "its budget is tight to get Loris operating or add more beds at Inlet Oaks."  Cash Collateral Motion at ¶ 19.  The Cash Collateral Motion further provides:

> [W]ith the lienholder's consent, Debtor has agreed to apply to employ Hilco Real Estate to attempt to sell the two assisted living facilities. Although West Town Bank has stay relief, Debtor believes it conceptually consents to a sale as opposed to immediately pursuing its state court remedies as to Loris.
> . . .
> Debtor may also agree to list the senior center for sale.
> . . .
> Debtor believes the Lienholders may consent to accept less than the amount budgeted to pay them, less than has been court ordered.

---

[32] Debtor's Ex. 4, May 2, 2024 Hearing on Motion to Prohibit Use of Cash Collateral.
[33] ECF No. 95.
[34] ECF No. 100, filed May 28, 2024.  The UST filed a response to the Motion to Reject Executory Contract (ECF No. 126) on June 14, 2024.
[35] ECF No. 127, filed June 14, 2024, amended on June 17, 2024 (ECF No. 131).
[36] ECF No. 128, filed June 14, 2024, amended on June 17, 2024 (ECF No. 132).

Cash Collateral Motion at ¶¶ 20-22.  The Cash Collateral Motion further notes that "Debtor believes in particular the [Interpleader Action] funds will assist with its day to day shortfall while the sales are pending."  *Id.* at ¶ 23.  The budget attached as an Exhibit to the Cash Collateral Motion reflects the same projections as the May 2nd Budget, with one difference—the adequate protection payments accounted for as a disbursement were decreased to $5,000.00 per month consistent with the May 15 Order.  According to the projections, as a result of the decrease in adequate protection payments, Inlet Oaks would become consistently cash positive by the second week of October, and, by the end of 2024, the projected cumulative cash flow was calculated to be $44,012.00.[37] The UST filed an objection to the Cash Collateral Motion primarily focusing on the budget's negative cumulative cash flow for June through September, thus creating an administratively insolvent estate.[38]

## Plan and Disclosure Statement

On June 5, 2024, Debtor filed a Plan and Disclosure Statement,[39] asserting that its assets are worth approximately $25,545,000.00[40] and its non-insider debts are just over $16,000,000.00.  Estimating professional fees, commissions and closing costs to be approximately $1 million, Debtor broadly concludes that there is sufficient equity in Debtor's assets to pay *all* creditors in full, assuming the real estate sells for $17 million.  Considering the prior appraisals presented to the Court, those projections appear overstated.  The UST has filed an objection to the Disclosure Statement on the grounds that it does not provide an accurate picture of Debtor's post-petition financial activity.[41]

---

[37] The same budget was also filed on June 4, 2024 as a Business Income and Expense Report.  See ECF No. 111, UST's Ex. G.
[38] ECF No. 112, at 5 ("Indeed, the budget indicates that the Debtor will create post-petition debts that it could not pay as they come due, thus increasing the administrative costs of this estate.").
[39] ECF Nos. 113 and 114.  A hearing on the Disclosure Statement is currently scheduled for July 25, 2024.
[40] ECF No. 114, at 12.
[41] ECF No. 163.

More specifically, as contemplated in the proposed Plan and described in the Disclosure Statement, Debtor intends to sell its real estate and pay the proceeds to USDA and West Town Bank. Moreover, its Plan proposes to use profits from its business operations, the funds from the Interpleader Action and any other funds recovered to pay administrative expenses, priority unsecured claims, and allowed general unsecured claims. In the Plan, Debtor estimates that administrative claims will be $100,000.00 and proposes to pay them by the effective date. The creditors are categorized in 12 separate classes. The first four classes consist of the secured claims of USDA and West Town Bank, and Debtor proposes to pay those claims in full—totaling $16,447,536.20—upon the sale of the real property. If not paid in full through the proceeds of the real estate, Debtor proposes that West Town Bank may sell Debtor's personal property on which it has a lien, with any remaining deficiency claim sharing *pari passu* with other general unsecured creditors in Class 10 [11]. The South Carolina Department of Revenue's secured claim of $877.29 is categorized in a separate class but Debtor filed an objection to the claim which is currently pending.[42] As to the priority claim of the IRS—which is currently claimed at $26,888.76—Debtor proposes to pay the debt beginning the month after its amount is determined and each month thereafter until paid in full by February 13, 2029. Through the Plan, Debtor proposes to reject all leases. While Debtor acknowledges that LEAF Capital Funding, LLC may claim rejection damages, it asserts that neither Horry County Council on Aging nor Capture Cares should have a claim against the Debtor. All other claims are treated as unsecured, and Debtor proposes to pay them over five years at no interest commencing on the effective date. While the Disclosure Statement expressly claims that all claims will be paid in full, the Plan does not propose a carveout from the sale of the real property for the payment of unsecured creditors but provides for payment

---

[42] ECF No. 135.

to unsecured over five years with no interest and without estimating their expected recovery on their claim.

**<u>Hearing on Motion to Dismiss</u>**

At the hearing on the Motion to Dismiss, McLean testified regarding the current operations and financial picture of the Debtor as well as Debtor's proposed Plan in the bankruptcy case.

*1.  Current Operations & Finances of Debtor*

McLean testified that the Inlet Oaks facility presently has 42 residents— a reduction from the 45 residents in place as of the Petition Date.  As of the hearing date, there was still no DHEC license for the Oaks of Loris facility or date that the Loris facility will reopen as the Court granted West Town Bank's lift stay motion on the property.  While a foreclosure sale has been set for July 23, 2024, McLean stated that West Town Bank has proposed an agreement to delay the foreclosure sale upon certain conditions, including (1) the sale of the properties through Hilco Real Estate, LLC ("Hilco"), (2) rejection of the Management Agreement with Capture Cares, and (3) retention of Annette Goodwin as Debtor's new executive director.  While the general terms had been discussed amongst the parties, it is clear that no definite agreement had been reached with West Town Bank.  According to McLean, Debtor has made two adequate protection payments to West Town Bank since the May 15 Order was entered.  Debtor has also decreased payroll expenses by getting volunteers from the community to help with patient care.  McLean admitted that since Capture Cares began managing the facilities, she and her other business entities had been providing funds for Debtor's operational shortfalls at the Inlet Oaks facility and that there were presently no business profits from the facility.

McLean acknowledged that Debtor does not currently have the funds to pay the professional fees sought in the fee applications currently on file but indicated it was Debtor's intent

to pay the fees with funds recovered from the Interpleader Action. In the Interpleader Action, other parties have asserted entitlement to approximately $130,000.00 from the Interpleader Action funds,[43] leaving only $175,000.00 of funds available for the payment of professional fees. However, McLean indicated Debtor's intent to object to several—if not all—of the claims of creditors to the Interpleader Action funds.[44]

Debtor has presented multiple cash flow statements to the Court to show its projected earnings, the most recent of which is Debtor's Exhibit 1. Debtor's Exhibit 1 shows a cumulative cash flow of $164,750.00 by the end of 2024, which represents a significant increase from the $44,012.00 in cumulative cash flow shown on the most recent prior budget from June 4, 2024 (UST's Exhibit G). The newly presented budget interestingly depicts a significant improvement in Debtor's cash flow from the projections reflected in the May 2nd Budget presented at the hearing on West Town Bank's motion to prohibit use of cash collateral which indicated that Debtor would experience a negative cash flow of $(158,282.00) in for 2024. [45]

McLean testified that the marked improvement to the budget shown in Debtor's Exhibit 1 resulted from actual numbers being better than the projections.[46] However, Debtor's financial advisor's representative, Sorvik, testified that the revenue projections shown on all of the cash flow statements presented into evidence are not based on the current number of residents that Debtor has in the facility.[47] Sorvik testified that Capture Cares has historically operated at a net loss and has no other income other than that from its operations at the Inlet Oaks facility. She

---

[43] Claims have been asserted by defendants in the Interpleader Action, including Leverage Roofing ($71,403.43), Timothy Hucks ($50,325.00), and Hill & Jordan CPAs ($9,959), which total $131,788.43.

[44] Debtor has already filed an Objection to Claim of M. Timothy Hucks (ECF No. 162, filed July 17, 2024).

[45] UST's Ex. H.

[46] Debtor's Ex. 7.

[47] Sorvik stated that the resident count used for the cash flow statement was calculated by her staff based on historical information and information from McLean and would have been determined using a conservative approach. She was not sure what resident count was used for any of the cash flow statements prepared by Newpoint.

further acknowledged that Debtor is not making full debt service payments to its secured creditors and secured debts are continuing to accrue on a monthly basis.

Sorvik further testified that the budget reflected in Debtor's Exhibit 1 does not take into account the reduction in residents that has occurred and further admitted that it also fails to include (1) any projections for loans from McLean or her business entities, (2) any proposed costs for transferring utility accounts to Debtor as a result of the rejection of Capture Care's Management Agreement, (3) any salary for Annette Goodwin as the executive director of the Inlet Oaks facility, (4) any payments to the secured creditors (including any adequate protection payments), or (5) any payments to Debtor's professionals, including payment of the $162,000.00 in fees sought prior to the hearing. Sorvik further acknowledged that the net cash flow shown on Debtor's Exhibit 1 appears to be insufficient to cover payment of all professional fees incurred by Debtor in this case.

### 2. *Debtor's Proposed Plan*

Debtor has determined that the best way to move forward in the bankruptcy case is to sell the Loris and Murrells Inlet Properties. McLean testified that Debtor has taken steps to list the real estate for sale, has received several offers for the properties,[48] and has signed an agreement to list the real estate for sale with Hilco whereby Hilco would be paid 5% commission and would receive up to $30,000.00 reimbursement of expenses from the top of the sales price.[49] According to McLean, after payment of Hilco's commission and expenses and closing costs, USDA and West Town Bank would receive the remainder of the proceeds from the sale. Based on previous offers made for the properties and her discussions with Hilco, McLean believes that the properties would sell for an amount sufficient to cover the amount of the liens on the Property, and possibly more.

---

[48] She stated that she had received an offer for $12.5 million for the Inlet Oaks facility on the day prior to the hearing but no agreement has been signed.

[49] Following the hearing, Debtor filed the Application to Employ Hilco as Real Estate Broker on July 10, 2024 (ECF No. 157).

When questioned by counsel for the UST regarding the Plan's proposal to use profits from Debtor's business operations, the Interpleader Action, and other funds to pay administrative fees and unsecured creditors, McLean stated that if the properties were sold, there will no longer be any profits from the assisted living facilities and the Plan will need to be amended accordingly as Debtor would be unable to make payments over the five-year term contemplated in the Plan to any creditors as proposed.[50]    Regarding the use of any Interpleader Action funds recovered by the Debtor, McLean stated that she has been in talks with West Town Bank and they were willing to work with Debtor regarding the use of those funds to pay other creditors.  While counsel for West Town Bank confirmed that the parties had been in discussions since the May 15 Order, no definite terms have been reached and no agreement has been entered into.    McLean clarified that the reference in the Plan to the use of "any other funds recovered" for the payment of administrative expenses, priority unsecured claims and allowed general unsecured claims refers to recovery from additional litigation of Debtor's claims against several other parties, which she admitted would require Debtor to retain counsel and incur further professional fees.

McLean testified that she, her husband, and her other business entities would continue to provide financial support to make sure residents are taken care of until the transition in ownership of the facilities is complete.  She was not sure how much money these entities had contributed to the operating expenses of the Inlet Oaks Facility since the Petition Date, but believed it was less than $50,000.00.  She stated that there is no contract in place between Debtor and her or her other entities to guarantee continued financial support to Debtor, and that any financial support would be considered a gift.  Moreover, no evidence was introduced as to the financial wherewithal of

---

[50] McLean testified that Debtor could continue its "mission" without its real estate, but it is unclear to the Court how Debtor could do so without the properties.

McLean or her other entities to support her general acknowledgment that they could continue to cover Debtor's budgetary shortfalls.

McLean understood that any loan to Debtor would have to be approved by the Court and could not be repaid otherwise.  Despite McLean's testimony that she and her business entities' contributions to Debtor were "gifts", without the expectation of being repaid, the May Monthly Operating Report that Debtor filed includes a copy of a Wells Fargo bank statement showing a $9,200.00 deposit into Debtor's account from Capture Child Development Center LLC on May 30, 2024, a transaction which is labeled a "Loan to Capture Cares Will Payback."[51]  Debtor's Exhibit 1 (Cash Flow Statement) further shows a non-operating disbursement of $9,200.00 made during the week of June 3, 2024, in an apparent repayment of this loan.

When questioned by the UST regarding the Debtor's motion to reject the Management agreement with Capture Cares and the ancillary effects of that rejection on other contracts for utilities and food service, McLean testified that Debtor intended to transfer all of those contracts into Debtor's name.  She acknowledged that there would be a cost of approximately $9,000.00 associated with transferring the utility contracts alone into Debtor's name, but she thought the contractors would be willing to work with Debtor on the transfer of the contract.

**CONCLUSIONS OF LAW**

### I.       11 U.S.C. § 1112(b)(4)(A)

The issues for the Court to decide with respect to the Motion to Dismiss were narrowed to whether the case should be dismissed for "cause" under 11 U.S.C. §1112(b)(4)(A) or for bad faith under 11 U.S.C. §1112(b).[52]  For the reasons set forth below, the Court finds that "cause" exists to dismiss this case.

---

[51] UST's Ex. C, at 22.
[52] Joint Statement of Dispute, ECF No. 151.

Section 1112(b)(1) provides:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court **shall** convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interest of the creditors and the estate.

11 U.S.C. § 1112(b)(1) (emphasis added).     As a party seeking an order dismissing Debtor's Chapter 11 case, the UST bears the burden to establish "cause." *See In re Congaree Triton Acquisitions, LLC*, 492 B.R. 843, 850 (Bankr. D.S.C. 2012); *In re Ashley Oaks Dev. Corp.*, 458 B.R. 280, 283 (Bankr. D.S.C. 2011) (citing *In re Landmark Atl. Hess Farms, LLC*, 448 B.R. 707 (Bankr. D.Md. 2011)).  Section 1112(b)(4) sets forth a non-exhaustive list of sixteen examples of cause sufficient to warrant conversion or dismissal. *See In re Congaree Triton Acquisitions, LLC*, 492 B.R. at 850 (citing *In re Draiman*, 450 B.R. 777, 826 (Bankr. N.D. Ill. 2011)) ("'Cause' is defined in § 1112(b)(4) with a list of examples, but that list is viewed as illustrative.").  Section 1112(b)(4)(A) lists "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" as "cause" to dismiss or convert a case.

Upon establishment of cause by a party in interest, the dismissal or conversion of a case is mandatory, unless the debtor can establish that the specific requirements set forth in § 1112(b)(2) are met. *See Ashley Oaks Dev. Corp.*, 458 B.R. at 284; *In re Keely and Grabanski Land P'ship*, 460 B.R. 520, 536 (Bankr. D.N.D. 2011) ("If cause has been established, the burden shifts to [d]ebtor to prove the case falls within the 'unusual circumstances' exception to § 1112(b)(1)'s mandatory dismissal").  More specifically, § 1112(b)(2) provides:

> The Court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing is not in the best interests of the creditors and the estate, **and** the debtor or any other party in interest establishes that –

19

(A) there is reasonable likelihood that a plan will be confirmed within
the timeframes established in sections 1121(e) and 1129(e) of this
title, or if such sections do not apply, within a reasonable
period of time; **and**

(B) the grounds for granting such relief include an act or omission of
the debtor **other than under paragraph (4)(A)** –

(i) for which there exists a reasonable justification for the act or
omission; **and**

(ii) that will be cured within a reasonable period of time fixed by
the court.

11 U.S.C. § 1112(b)(2) (emphasis added).

Section 1112(c), however, provides that the court may not convert a chapter 11 case to

chapter 7 if the debtor "is not a moneyed, business or commercial corporation, unless the debtor

requests such conversion." Although the Bankruptcy Code does not define what is intended by a

corporation that is not a "moneyed" business, courts have interpreted that to be limited to

corporations organized as not for profit. *See* 7 COLLIER ON BANKRUPTCY ¶ 1112.08 at n. 1 (16th

ed. 2024); *see also In re Nat'l Rifle Ass'n of Am.*, 628 B.R. 262, 270 n. 48 (Bankr. N.D. Tex. 2021);

*In re Mandalay Shores Coop. Hous. Ass'n*, 22 B.R. 202 (Bankr. M.D. Fla. 1982). Because Debtor

is a non-profit organization and has not consented to the conversion of the case, the Court does not

need to decide whether the case should be dismissed or converted, as the only choice would be to

dismiss. Moreover, while this is a case where, under different circumstances, the Court would

consider the appointment of a trustee pursuant to 11 U.S.C. § 1104, no party in interest has

requested that remedy nor is the Court inclined to entertain that option given any additional

professional fees would only deepen Debtor's administrative insolvency at this point.

After a thorough review of the records, including the factual findings previously made by

the Court in its May 15 Order, the exhibits introduced into evidence at the hearing, the testimony

of the witnesses, and arguments of counsel, the Court finds that the UST has demonstrated that cause exists to dismiss the case due to Debtor's substantial and continuing loss and diminution of the estate <u>and</u> the absence of a reasonable likelihood of rehabilitation.[53]

### A. Substantial and Continuing Loss

To establish "cause" pursuant to 11 U.S.C. § 1112(b)(4)(A), the UST must prove that Debtor suffered either a negative cash flow or declining asset value post-petition. *See Ashley Oaks Dev. Corp.*, 458 B.R. at 285 (citing *In re Landmark Atl. Hess Farms, LLC*, 448 B.R. at 713); *In re Creech*, 538 B.R. 245, 248-49 (Bankr. E.D.N.C. 2015) ("The circumstances indicating substantial or continuing loss or diminution must have occurred post-petition; pre-petition events will not establish cause."); *In re Paterno*, 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014) (citing *In re Miller*, 496 B.R. 469, 479 (Bankr. E.D. Tenn. 2013)) ("This test is often met by showing that the debtor suffered or has continued to experience a negative cash flow or declining asset values following the entry of the order for relief."). When examining this prong, courts often analyze the debtor's track record, taking into account "the financial prospects of the debtor and the financial records filed with the court." *In re Paterno*, 511 B.R. at 66-67. "An inability on the part of the debtor to pay current expenses as they come due, combined with an absence of reliable income can satisfy this standard." *Id.* (citing *In re Park*, 436 B.R. 811, 816 (Bankr. W.D. Va. 2010)); *see also In re ARS Analytical, LLC*, 433 B.R. 848, 862 (Bankr. D.N.M. 2010) (dismissing a Chapter 11 case where the debtor sustained cash losses in the first four months after filing bankruptcy).

---

[53] In light of the Court's conclusion that cause to dismiss exists under § 1112(b)(4)(A), it is unnecessary to also determine whether dismissal is appropriate for bad faith. Bad faith in filing the petition may constitute "cause" for purposes of § 1112(b). *Carolin Corp. v. Miller,* 886 F.2d 693, 700 (4th Cir. 1989). A party seeking dismissal of a chapter 11 case for bad faith in filing must demonstrate (1) objective futility and (2) subjective bad faith. *Id.* at 700-01.

The UST argues that the evidence reflects a substantial or continuing loss or diminution to the Debtor's estate.  The Court agrees.  From the outset, the Court notes that relief from stay as to the Loris Property has already been granted, and while West Town Bank has in concept agreed to Debtor selling that property along with the Murrells Inlet Property through a § 363 sale, it is continuing, on parallel paths, with a foreclosure sale scheduled for the end of July.  Thus, West Town Bank could pull the trigger at any given time to derail what Debtor's prospects to be accomplished through bankruptcy.  Moreover, even under the most recent and most optimistic budget proposed by Debtor—Exhibit 1—Debtor cannot pay all of its administrative expenses by the end of the year.  Debtor's budget in Exhibit 1 reflects a cumulative positive cash flow of $164,750.00 by the end of 2024.  In the first four months of this case, Debtor has already incurred administrative expenses totaling $162,000.00, which does not include attorney's fees incurred from June 8, 2024 through the date of the Motion to Dismiss hearing.  Debtor acknowledges that professional fees will continue to accrue but argues they will not soar in the next few months because they do not anticipate litigation of further disputes similar to what occurred in the beginning of the case.    However, Debtor's initial request to pay professional fees totaling $162,000.00 does not include the attorney's fees necessary to prepare an amended plan and disclosure statement—which McLean testified would be necessary—to prepare for and attend the confirmation hearing, to file objections to multiple proofs of claim and defend any responses, and to perform any other services necessary to conclude this case.  Moreover, the budget does not account for other significant expenses that would be incurred by Debtor if this case were allowed to go forward, including adequate protection payments to Debtor's secured creditors, UST quarterly fees, and ancillary costs arising from the rejection of the Capture Cares management

contract, such as utilities and food service contract transfer fees and the salary for Annette Goodwin as the new manager of the Inlet Oaks facility.[54]

Debtor argues that it can use funds recovered from the Interpleader Action to cover administrative expenses and other expenses. However, West Town Bank has claimed an interest fully encumbering the funds and there is no evidence that West Town Bank has agreed to release its lien. Debtor is further banking on the recovery from other potential litigation, including any causes of action arising from the forensic investigation of Debtor's former accountant, as potential sources of revenue, but such litigation has not yet been commenced, may lead to increased professional fees, and is unlikely to yield any recovery to Debtor before the end of the year.

The Court is not convinced that Debtor's budget and projections set forth in Exhibit 1 are credible. Exhibit 1 is based upon rental income received from Debtor's residents, but neither McLean nor Debtor's financial advisor was able to testify regarding the number of residents that was relied upon to calculate its income under the most recent budgets presented into evidence. The testimony of Newpoint's representative at the May 2, 2024 hearing indicated that the projections set forth in the May 2nd Budget were based upon the Inlet Oaks facility having 53 residents by July 1, 2024. The actual number of patients has declined to 42 as of the hearing on July 9, 2024. Additionally, Exhibit 1 does not show consistent positive net cash flow until November 10, 2024. The budget comparison of projected versus actual numbers shown in Debtor's Exhibit 7 demonstrates that Debtor has sustained cash losses since the beginning of the case, with an accumulated deficit of $12,608.00 since April 15, 2024.[55] McLean and her entities

---

[54] In the Motion to Reject Executory Contract, Debtor indicated that Ms. Goodwin would be paid $2,500.00 per month. ECF No. 100, at ¶ 12.

[55] Debtor's Ex. 7. Notably, in Debtor's monthly operating report for May 2024 (ECF No. 137), Debtor reported a cash balance at the end of the month of $28,710 and reported a net profit of $9,500. However, of Debtor's total

have been covering the deficiencies thus far, ensuring that the residents have food, appropriate care, and utilities, but they have no contractual obligation to continue to do so. McLean testified that the funds contributed by her or her businesses to Debtor were a gift. However, the evidence reflects that Capture Child Development Center transferred funds of $9,200.00 to Debtor as a loan and appears to have been repaid in full without authorization of the Court. The evidence reflects that Debtor is incurring debt without a motion to incur debt, which the Court finds concerning.[56]

Debtor's financial records over the past year reflect that it is unable to pay its expenses as they come due without the voluntary contributions from McLean and her other business entities. While conceding that to date it has continued to experience a negative cash flow, Debtor argues that, as Mark Ruday testified at the May 2, 2024 hearing, the continued negative cash flow "will improve and Debtor's net cash flow will break even or become profitable upon the increase in residents, which is probably this year."[57] However, the number of residents at the Inlet Oaks facility has declined—not increased as projected. McLean testified that Debtor has reduced its payroll expenses by increasing its reliance on volunteers from the community to provide care to the residents of the Inlet Oaks facility. This is a situation that would benefit from the oversight provided by a Chapter 11 Trustee; however, there are no funds available to pay a trustee. West

---

receipts of $31,645.00, $30,000.00 was attributable to Newpoint disgorging funds back to Debtor pursuant to the order approving its retention. *See* ECF No. 71. Had Debtor not received these funds, it appears it would have either a negative cash balance or would not have been able to pay West Town bank its required $5,000 adequate protection payments or other bills. Exhibit 7 indicates that for weeks 4 and 7 collections were $22,000 higher than projected, however, it is not clear whether the increase was due to the $30,000.00 attributable to Newpoint disgorgement.

[56] A cursory review of the monthly operating reports reflects funds being deposited from Capture Child Development Center into Capture Cares account and funds being paid back to it. The April monthly operating report reflects $7,309.23 being paid from Capture Cares to Capture Child Development Center but it is not clear whether any funds were deposited into Capture Cares' account from the entity. In May, it appears that Capture Child Development Center deposited a total of $11,200 into Capture Cares account and then received $9,298.03 back. Thus, it is hard for the Court to determine the reliability of the projections presented in the various budgets.

[57] ECF No. 101 (Debtor's Objection to Motion to Dismiss), at 1.

Town Bank's condition that Debtor terminate the Capture Cares Management agreement and hire a new executive director to stay the foreclosure sale of the Loris Property indicates that it has lost confidence in Capture Cares' ability to successfully operate the facility. Debtor's financial prospects are uncertain at best, and the Court has little confidence that Debtor will generate a consistent, positive cash flow by November of 2024 based on the evidence presented. While there is no evidence indicating that Debtor's properties are declining in value, the costs of administering this bankruptcy case continue to grow, rendering it administratively insolvent, and leaving the Court to question how there will be any funds available for payment to unsecured creditors at the conclusion of this case. For these reasons, the Court concludes that the first prong of § 1112(b)(4)(A)—a substantial or continuing loss or diminution to the Debtor's estate—has been met.

### B. Absence of a Reasonable Likelihood of Rehabilitation

The Court must also find the absence of a reasonable likelihood of rehabilitation, which is not synonymous with whether the debtor can confirm a plan, but rather whether the debtor has sufficient business prospects which can establish a "cash flow from which current obligations can be satisfied." *In re Ashley Oaks Dev. Corp.*, 458 B.R. at 285-86. This standard has been eloquently summarized as follows:

> In order to determine whether the debtor's business prospects are sufficient to justify a finding of a reasonable likelihood of rehabilitation, the court should determine not only whether the causes of the debtor's continuing losses can be corrected, but also whether the debtor or some other party in interest is capable of performing the necessary remediation. In almost every case, the debtor's prospects will depend on whether the debtor has formulated, or can formulate within a reasonable amount of time, a reasonably detailed business plan.

*See* 7 COLLIERS ON BANKRUPTCY ¶ 1111.04. Notably, courts have held that "where a debtor proposes a plan of pure liquidation, there is no likelihood of rehabilitation." *In re Paterno*, 511 B.R. at 68 (citing *In re BH S & B Holdings, LLC*, 439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010); *In re*

*Costa Bonita Beach Resort Inc.*, 479 B.R. 14, 43 (Bankr. D.P.R. 2012) ("Whereas confirmation of a plan could include a liquidation plan, rehabilitation does not include liquidation.")); *see also In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51 (B.A.P. 6th Cir. 2013) (same); *In re Exigent Landscaping, LLC*, 656 B.R. 757, 765-66 (Bankr. E.D. Mich. 2024) (same). "The purpose of § 1112(b)(1) is to 'preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *Loop Corp. v. U.S. Tr.,* 379 F.3d 511, 516 (8th Cir. 2004) (quoting *In re Lizeric Realty Corp.,* 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995)).

The UST argues that Debtor's plan is proposing a liquidation rather than a rehabilitation and therefore there is no likelihood of rehabilitation. The UST further contends that the bankruptcy court is not the best forum to conduct the liquidation of Debtor's assets and that the only parties who will benefit from this bankruptcy case are the professionals. While Debtor concedes that the only way forward in this bankruptcy case is to quickly sell its properties to pay its creditors,[58] it anticipates a benefit to unsecured creditors as well. Debtor believes there are grounds to object to many of the unsecured claims. However, even if the objections were sustained, there will still be a small amount of unsecured claims to be paid, including claims from LEAF Capital Funding, IRS, South Carolina Department of Revenue, Performance Food Service, and Zurich Insurance. Debtor further argues that it is benefitting from a stay of three pending lawsuits in state court, for which Debtor will not have to incur costs to defend while in bankruptcy, and those claimants would instead be paid through the claims process. Accordingly, Debtor posits that bankruptcy is the best forum for addressing creditor claims and offers the greatest opportunity for recovery for its unsecured creditors.

---

[58] McLean testified that Debtor could continue its mission of providing care for senior citizens within its community without its real estate but did not explain how it could do so.

26

Debtor's ability to "rehabilitate" is unrealistic. Debtor is proposing a liquidating plan. There are simply too many contingencies that must be met for Debtor's plan to succeed and for unsecured creditors—or administrative claimants for that matter—to receive a payment. Debtor's only operating business—Inlet Oaks—is cash flow negative and relying on what is essentially charitable donations to sustain its operations. Debtor has sought to employ Hilco to market and conduct a § 363 sale of the Murrells Inlet Property and the Loris Property, despite West Town Bank having obtained relief from stay as to the Loris Property. West Town Bank's consent to Debtor's sale of the Loris Property together with the Murrells Inlet Property depends upon Debtor meeting certain contingencies which have not been clearly defined or agreed to. One such condition is the rejection of the Management Agreement with Capture Cares, and the UST has raised significant concerns regarding the ancillary effects of that rejection on other contracts providing critical services to the Inlet Oaks facility, raising further concerns as to how such rejection would be in the best interest of the estate. These concerns are shared by the Court. If a sale were to proceed through the bankruptcy process, it is uncertain and questionable at best whether the properties would sell for a sufficient amount to allow for the payment of any administrative claims and unsecured claims. The evidence of the Properties' value previously presented to the Court does not indicate that payment of such claims is likely. If the sale price does not exceed the amount of the liens, the secured creditors would have to agree to any carve out from the funds to pay administrative claims and unsecured claims from the sale proceeds, and there is no certainty that they will agree to do so. West Town Bank appeared at the hearing and did not take a position on the Motion to Dismiss or indicate any definite willingness to agree to a carve out. West Town Bank has been in discussions with Debtor, but it is in essence holding the reins to this bankruptcy case while administrative expenses are accumulating and could decide

to back out of any negotiations at any moment. While the Court is cognizant that an assisted living facility operates on Debtor's property, even outside of bankruptcy the state long-term ombudsman would ensure the patients' well-being and, as West Town Bank has indicated in prior pleadings and at prior hearings, they would seek the appointment of a receiver to orderly ensure the transition resulting from any sale.

Debtor has admitted that the Plan and Disclosure Statement require amendment. While the case has been pending for four months, it is optimistic to expect Debtor to obtain a confirmed plan within the next four months or Hilco to find a buyer and present a contract for the sale of the properties within that timeframe. During this time, administrative expenses would continue to accrue. Debtor's current Plan proposes to use profits from its business operations, funds from the Interpleader Action, and any other funds recovered to pay administrative expenses, priority unsecured claims, and allowed general unsecured claims. However, Debtor's budget reflects that Debtor will not have any consistent profits from its business operations until at least November of 2024, the funds from the Interpleader Action are fully encumbered by liens, and recovery from other potential litigation is not likely to occur before the end of the year. Debtor's ability to increase its monthly operating income from obtaining new residents appears out of its control and hampered by negative publicity. Accordingly, the Court finds that the second prong of § 1112(b)(4)(A) has also been met, as Debtor's business prospects and proposed liquidation do not support a finding of a reasonable likelihood of rehabilitation.

## II.    Remand of Interpleader Action

Having determined that this case is dismissed, the Court must also determine whether to retain jurisdiction of the Interpleader Action. Pursuant to 28 U.S.C. § 1452(b), a court may remand a removed proceeding "on any equitable ground." "When considering equitable remand,

28

bankruptcy courts generally 'consider judicial economy, comity, respect for state court capabilities, and the effect on administration of the estate." *In re Earth Structures, Inc.,* 490 B.R. 199, 220 (Bankr. D.S.C. 2013) (quoting *Corley v. Salinas (In re Salinas)*, 353 B.R. 124, 128 (Bankr. D.S.C. 2006) (internal quotations omitted)). The Interpleader Action was pending prior to the bankruptcy case in state court and is related to Debtor's bankruptcy case in the sense that it may affect the administration of the bankruptcy estate, but it is not a core proceeding.  *See In re Palmetto Interstate Dev. II, Inc.,* 653 B.R. 230, 245 (Bankr. D.S.C. 2023) ("A claim or proceeding arises in a bankruptcy case (and is thus a core proceeding) only when it would have no practical existence but for the bankruptcy, while a proceeding is related to a bankruptcy case if such proceeding may in any way affect the administration of the bankruptcy estate.") (citing *Meredith v. Wells Fargo Bank, N.A. (In re Meredith),* No. 10-32366-KRH, 2014 WL 6845444, at *4 (Bankr. E.D. Va. Nov. 26, 2014)).

Applying the above factors, the Court finds that retention of jurisdiction over the Interpleader Action is not appropriate.  The Interpleader Action is based on state law claims and was already pending in state court for nearly seven months before the bankruptcy case was filed. Judicial economy would not be served by retaining jurisdiction because the Interpleader Action has not significantly progressed in the bankruptcy court—only a motion for judgment on the pleadings has been filed, which has not yet been argued and could be decided by the state court. No discovery has been conducted in this adversary proceeding.  Given the stage of the proceedings, the Court has no concerns regarding fairness to the parties if the case is not retained.  Retaining jurisdiction would also not be more convenient for the parties, as the parties involved in the Interpleader Action are mostly located or do business in Horry County.  Finally, comity with the state court is better served by the Court declining to retain jurisdiction, as the state court already

has possession of the funds in dispute.  For these reasons, the Court declines to retain jurisdiction

of the Interpleader Action and remands the adversary proceeding.

**CONCLUSION**

Based on the foregoing, it is hereby ORDERED that:

1.  The Motion to Dismiss filed by the UST is granted, and this case is dismissed pursuant
    to 11 U.S.C. § 1112(b)(1) and (4)(A); and

2.  The Court remands the Interpleader Action to the Horry County Court of Common
    Pleas pursuant to 28 U.S.C. § 1452(b).

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**07/18/2024**



Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

Entered: 07/18/2024

30